

FILED

MAY 3 1 2011

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES *ex rel.* JOSEPH VIEL; COMMONWEALTH OF VIRGINIA *ex rel.* JOSEPH VIEL; STATE OF NORTH CAROLINA *ex rel.* JOSEPH VIEL and JOSEPH VIEL, INDIVIDUALLY, <br><br> Plaintiffs, <br><br> v. <br><br> EASTERN SHORE AMBULANCE, INC.; d/b/a FIRST MED, INC., <br><br> Defendants. | CIVIL ACTION NO. $2:11cv301$ <br><br> COMPLAINT <br><br> JURY TRIAL DEMANDED <br><br> FILED IN *CAMERA* AND UNDER SEAL |

## COMPLAINT

*Qui tam* Relator-Plaintiff, Joseph Viel ("Relator-Plaintiff"), by and through his undersigned attorneys, on behalf of the United States of America, the Commonwealth of Virginia, the State of North Carolina, and himself individually, allege as follows in support of his Complaint against Defendant, Eastern Shore Ambulance, Inc. doing business as First Med, Inc., based upon personal knowledge and relevant documents:

## I.     INTRODUCTION

1.     In this action, Relator-Plaintiff alleges that Defendant Eastern Shore Ambulance, Inc., doing business as First Med, Inc., is liable under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* , the Virginia Fraud Against Tax Payers Act, VA Code Ann. §§ 8.01-216.3(A), 32.1-315, and the North Carolina False Claims Act, N.C.G.S.A. § 1-605, *et seq.* arising from the Defendant's submission of false and fraudulent records,

statements, and claims for payment by the United States to the Medicare and Medicaid

programs and for payment by the Commonwealth of Virginia and the State of North

Carolina under the Medicaid program, from at least December 2009 to the present.

2.      The facts alleged in this *qui tam* Complaint establish that Defendant

Eastern Shore Ambulance, Inc. falsely certified and/or caused to be certified, that patients

transported by Defendant's ambulances were not ambulatory and that their transportation

by ambulance was medically necessary as per Medicare and Medicaid program

reimbursement requirements.  As part of this fraudulent scheme, a software program used

company-wide by the Defendant was altered, manipulated and re-configured to facilitate

the submission of its false claims.  In addition, the Defendant also paid ambulance

personnel up to $500 each month to prepare "perfect paperwork" falsely confirming that

the patients were not ambulatory or otherwise required transportation by ambulance.

## II.     JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. §§ 1331 and 1345.

4.      This Court has personal jurisdiction over the Defendant pursuant to 31

U.S.C. § 3732(a).  Jurisdiction is proper over the Defendant because the Defendant can

be found in, resides in, and/or has transacted business within this Court's jurisdiction, and

some of the acts in violation of 31 U.S.C. § 3729 occurred within this District.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b)-(c), and 31

U.S.C. § 3732(a) because the Defendant resides in or transacts business in this District

and because a substantial portion of the events or omissions giving rise to the claims

alleged herein occurred in this District.

## III.    THE PARTIES

6.      Relator-Plaintiff is a resident of the Commonwealth of Virginia and citizen of the United States.  Having had over twenty (20) years of experience in the ambulance industry, Relator-Plaintiff worked for Defendant Eastern Shore Ambulance, Inc. from December 2009 to January 2011 as a paramedic.  Relator-Plaintiff files this *qui tam* Complaint against Defendant on behalf of the United States of America pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733, the Virginia Fraud Against Tax Payers Act, VA Code Ann. §§ 8.01-216.3(a), 32.1-315, and the North Carolina False Claims Act, N.C.G.S.A. § 1-605, et seq.

7.      Defendant Eastern Shore Ambulance, Inc. ("ESA"), d/b/a First Med, Inc., is a Virginia corporation with its principal place of business at 23378 Commerce Drive, Accomack, Virginia, 23301.  Defendant is engaged in the business of providing medical transportation services, including non-emergency ambulance transportation services, to Medicare and Medicaid beneficiaries in the Commonwealth of Virginia and the State of North Carolina.  A large portion of these beneficiaries are dialysis patients.

## IV.    THE FALSE CLAIMS ACT

8.      The federal False Claims Act ("FCA") provides, in pertinent part, that any person who:

    (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

    (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim...

                \*\*\*

    is liable to the United States Government [for statutory damages and such penalties as are

3

allowed by law].

31 U.S.C. §§ 3729(a)(1).

9.      The False Claims Act further provides that "knowing" and "knowingly"

    (A)    means that a person, with respect to information—
        (i)    has actual knowledge of the information;
        (ii)    acts in deliberate ignorance of the truth or
            falsity of the information; or
        (iii)    acts in reckless disregard of the truth or
            falsity of the information; and
    (B)    requires no proof of specific intent to defraud.

31 U.S.C. §§ 3729(b)(1).

## VI.    MEDICARE AND MEDICAID HEALTHCARE PROGRAMS

### A.    The Medicare Program

10.      Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.,*

establishes the Health Insurance for the Aged and Disabled program, commonly referred

to as the Medicare Program (the "Medicare Program" or "Medicare").

11.      The Medicare Program is comprised of four parts.  Medicare Parts A, C,

and D are not directly at issue in this case.  Medicare Part B provides Federal

Government funds to help pay for, among other things, Ambulance Services provided to

Medicare beneficiaries.  *See* 42 U.S.C. § 1834(1); *see generally* 42 U.S.C. §§ 1831 –

1848.

12.      Medicare Part B is funded by insurance premiums paid by enrolled

Medicare beneficiaries and by contributions from the federal treasury.  Eligible

individuals may enroll in Part B to obtain benefits in return for payments of monthly

premiums as established by HHS.  *See* 42 U.S.C. §§ 1836, 1839.

4

13.     Payments under the Medicare Program are often made directly to service providers, such as Ambulance Services, rather than to the patient (the "beneficiary"). This occurs when the provider accepts assignment of the right to payment from the beneficiary. In that case, the provider submits its bill directly to Medicare for payment.

14.     The Secretary of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS"), an operating division of HHS.

15.     CMS, in turn, contracts with Medicare Administrative Contractors, formerly known as Part B Carriers (hereinafter "MACs") to administer, process and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund (the Medicare Trust Fund). In this capacity, the MACs act on behalf of CMS.

16.     The Medicare Program, through the MAC for Virginia, pays a significant portion of every claim. The Medicare beneficiary, or their supplemental insurance carrier, is required to pay the balance owed the provider. The beneficiary's payment is sometimes referred to as a "co-payment." Beneficiaries also pay deductibles.

17.     In order to bill the Medicare Program, a provider must submit an electronic or hard-copy claim form called a CMS-1500 form. When the CMS-1500 form is submitted, the provider certifies that the services in question were "medically indicated and necessary for the health of the patient."

18.     On the CMS-1500 form, the provider must state, among other things, the procedure(s) for which it is billing Medicare, the identity of the patient, the provider number, and a brief narrative explaining the diagnosis and the medical necessity of the services rendered.

19.    All healthcare providers, including ambulance services, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Part B. A provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services, including, but not limited to, the following:

a.    Medicare reimburses only reasonable and necessary medical services furnished to beneficiaries. *See* 42 U.S.C. § 1395y(a)(1)(A); and

b.    Providers must assure that they provide economical medical services, and then, only when, and to the extent, medically necessary. *See* 42 U.S.C. § 1320c-5(a)(1).

20.    Medicare regulations exclude from payment services that are not reasonable and necessary. *See* 42 C.F.R. § 411.15(k)(1).

21.    Because it would not be feasible to review medical documentation before paying each claim, the MACs generally make payment under Medicare Part B on the basis of the providers' certification included on the Medicare claim form.

**B.    The Medicaid Program**

22.    Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, established what is commonly known as the Medicaid Program (the "Medicaid Program" or "Medicaid"). Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The United States provides matching funds to a state to fund the program and also ensures that the state complies with minimum standards in the administration of the Medicaid Program.

23.     Medicaid programs are administered by the states in accordance with federal statutes and regulations, and pursuant to state plans, which must be approved by the Secretary of HHS. *See* 42 C.F.R. § 430.0.

24.     While Medicaid programs are administered by the states, they are jointly financed by the federal and state governments. The annual federal share of Medicaid expenditures during the relevant period varied from year to year in each state.

25.     Generally, state Medicaid agencies pay healthcare providers for services rendered to Medicaid beneficiaries from state or local funds and from federal funds made available to them by the Federal Government for that purpose. Each quarter, based on the state's estimate of anticipated Medicaid expenditures, CMS makes available to the state federal funds for reimbursement of Medicaid expenditures. *See* 42 C.F.R. § 430.30.

26.     Each state periodically draws down those federal funds and uses those funds to pay providers.

27.     Each state must have a single state agency to administer the Medicaid program. *See* 42 U.S.C. § 1396a(a)(5). The Virginia Department of Medical Assistance Services ("DMAS") administers the Medical Assistance Program (Medicaid) in Virginia.

28.     Ambulance providers bill Medicaid beneficiaries by submitting claim forms to the applicable state agency or its designated agent(s). As with Medicare, these claim forms contain certain information regarding the service provided, upon which the state agencies rely in making payment to the ambulance provider.

VII.    **GENERAL ALLEGATIONS**

A.      **Medicare's Rules for Transportation of Dialysis Patients**

29.     Medicare does not pay for any and all services furnished to beneficiaries,

but only those which are "reasonable and necessary for the diagnosis or treatment of

illness or injury..." 42 U.S.C. § 1395y(a)(1)(A).  With respect to Ambulance Services in

particular, Medicare covers such services only "where the use of other methods of

transportation is contraindicated by the individual's condition, but only to the extent

provided in regulations."  42 U.S.C. § 1395x(s)(7).

30.     The Medicare regulations regarding ambulance transport are set forth in

42 C.F.R. § 410.40, which is entitled "Coverage of ambulance services."

31.     Accordingly, the regulations for ambulance transportation services in

effect for the entire period of time covered by this Complaint provide, in relevant part:

> (d) Medical necessity requirements –
>
> (1) General rule. Medicare covers ambulance services, including fixed wing and rotary wing ambulance services, only if they are furnished to a beneficiary whose medical condition is such that other means of transportation are contraindicated.  The beneficiary's condition must require both the ambulance transportation itself and the level of service provided in order for the billed service to be considered medically necessary.  Nonemergency transportation by ambulance is appropriate if either:  the beneficiary is bed-confined, and it is documented that the beneficiary's condition is such that other methods of transportation are contraindicated; or, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required.  Thus, bed confinement is not the sole criterion in determining the medical necessity of ambulance transportation.  It is one factor that is considered in medical necessity determinations.  For a beneficiary to be considered bed-confined, the following criteria must be met:
>
> (i)     The beneficiary is unable to get up from bed without Assistance;
> (ii)    The beneficiary is unable to ambulate;
> (iii)   The beneficiary is unable to sit in a chair or wheelchair.

8

42 C.F.R. § 410.40(d)(1).

32.    In addition, CMS established a requirement that "nonemergency, scheduled ambulance services," such as maintenance dialysis, are covered only if "the ambulance provider or supplier, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements of paragraph (d)(1) of this section are met." 42 C.F.R. § 410.40(d)(2). This physician certification is called a Physician's Certification Statement ("PCS").

33.    The Medicare Benefit Policy Manual (the "MBPM"), which sets forth the rules and regulations for Medicare reimbursement, further describes the requirements for coverage of ambulance transport. For example, the MBPM states:

> Medical necessity is established when the patient's condition is such that use of any other method of transportation is contraindicated. In any case in which some means of transportation other than an ambulance could be used without endangering the individual's health, whether or not such other transportation is actually available, no payment may be made for ambulance services. In all cases, the appropriate documentation must be kept on file and, upon request, presented to the carrier/intermediary. It is important to note that the presence (or absence) of a physician's order for a transport by ambulance does not necessarily prove (or disprove) whether the transport was medically necessary. The ambulance service must meet all program coverage criteria in order for payment to be made.

MBPM at § 10.2.1.

34.    To obtain reimbursement for ambulance transportation, the provider must submit and certify to details establishing that Medicare's medical necessity requirements were met. *See* 42 CFR 410.40(d)(3)(v).

**B.     Medicaid's Rules for Transport of Dialysis Patients**

35.     Medicaid also applies medical necessity and documentation requirements for reimbursement of ambulance patients.

36.     The Medicaid Program, as administered in the Commonwealth of Virginia and the State of North Carolina, has basically the same medical necessity requirements for ambulance services as under the Medicare Program.

**C.     The Defendant's False Claims**

37.     From at least December 2009 to the present, the Defendant knowingly submitted, or caused the submission of, false claims to Medicare and Medicaid, and created false records and statements in order to receive reimbursement from Medicare and Medicaid for non-emergency ambulance transportation services provided to dialysis patients and others.

38.     During this time, the Defendant knowingly falsely certified to the truthfulness and accuracy of electronic claim forms submitted to Medicare and Medicaid for transportation services provided to dialysis patients. The Defendant created and/or submitted documentation that falsely represented that a patient was either bed-confined or that transportation by ambulance was otherwise medically required. However, in fact, many of the patients were not bed-confined nor did they require ambulance transport under the applicable Medicare or Medicaid requirements.

39.     The Defendant's fraudulent conduct included, on certain occasions, assigning condition codes and International Classification of Disease (ICD-9) codes which indicated that the patient was bed-confined or, that transportation by ambulance was otherwise medically required, when the patient was able to sit in a wheelchair, thus

was not bed-confined according to the Medicare definition of bed-confinement, and the patient could have traveled by other means.

40.     The Defendant's fraudulent conduct also included obtaining and fabricating Physician Certification Statements containing false information regarding a patient's condition. By way of example, at the end of each of Relator-Plaintiff's shifts, his supervisor would check additional boxes on the PCS that were intentionally left blank by the facility staff.

41.     In addition, during Relator-Plaintiff's orientation, Defendant's Training Director Samantha Ward instructed the staff that if a PCS could not be obtained from an authorized person, to simply have an unauthorized person endorse the PCS without writing their title. On numerous occasions, Relator-Plaintiff witnessed Licensed Practical Nurses ("LPN") complete the PCS by forging the names of Registered Nurses ("RN") who were unavailable at the time. Pursuant to CMS guidelines, LPNs are not authorized signatories to the PCS. Upon receiving the PCS at Defendant's office, Defendant's personnel would then write in "RN" next to the facility staff's signature using the same color ink.

42.     Relator-Plaintiff also routinely observed that the respective facility staff would write practically anything on the PCS to be relieved of a patient. The facility staff is often instructed what to write on the PCS to facilitate an ambulance discharge because an ambulance discharge is often the quickest means of discharge.

43.     Therefore, Defendant was determining the information listed on the PCS and it was then being supported by the crew's documentation in the Patient Care Reports causing the documents to appear as though they support each other. It follows that the

there would be no discrepancy in the paper trail of the transfer. If a discrepancy did exist, Defendant's office staff would simply discard PCS forms that showed a patient's true condition and recreate a new PCS that would justify the ambulance transfer.

44.    At all relevant times, the Defendant knew, deliberately ignored or recklessly disregarded, that the claims submitted to Medicare and Medicaid by the Defendant falsely described the condition of certain dialysis and other patients on the specific day the patient was transported and were false or fraudulent because they did not represent the accurate physical condition of the patient on that day.

45.    In furtherance of its fraudulent scheme, Defendant altered and reconfigured a key software billing program called "Ambulance Run Tracking" ("ART-6") so that a patient's true condition was concealed and then misrepresented in the Patient Care Reports to establish the required medical necessity for Defendant's transportation services where none existed. Through the alteration and re-configuration of Defendant's company-wide ART-6 software program, upon information and belief, the Defendant created a false narrative template that was used to justify the non-emergency medical transportation of ineligible patients in the State of North Carolina and the Commonwealth of Virginia. The ART-6 software program had already been altered when Relator-Plaintiff Viel was hired by the Defendant in December 2009. Additional alterations were made in November 2010 under the direction of the Defendant's Director of Operations, Steve Guion and completed by Samantha Ward, the Defendant's Training Officer, among others. The altered software provided a template to the ambulance crews that could not be changed and stated, among other things, "the patient was found in bed." *The changes prevented First Med's ambulance crews from creating documentation that would indicate*

*that the transfer was medically unnecessary.* For example, if Relator-Plaintiff were to key in that an ambulance transfer was unnecessary, the report generated would indicate that the patient was "found in bed" and "required stretcher transport".

46.     In furtherance of its fraudulent schemes, Defendant also generated false Patient Care Reports using the ART-6 computer program, which were then used to obtain reimbursement from Medicare and Medicaid. These reports contained a false "Narrative" which showed the patient's condition as requiring transportation by ambulance. These false conditions included "AMS" (altered mental status); "BKA" (below knee amputation) and "Special Handling-Pain". Relator-Plaintiff Viel was briefed about the false "Narrative" by Samantha Ward at his new employee orientation. He and the other ambulance personnel were told by Ms. Ward that if their Patient Care Reports did not conform to the false narrative needed to justify Medicare/Medicaid reimbursements, those reports would be "corrected" in the Defendant's offices. False PCRs were prepared for virtually all of the patients transported by Relator-Plaintiff Viel and other ambulance personnel while Relator-Plaintiff was employed by the Defendant.

47.     Defendant also paid its ambulance personnel up to $500 monthly bonuses to prepare "perfect paperwork" falsely describing a patient's medical condition so that their transport by ambulance appeared to be medically necessary. The Defendant started paying these monthly bonuses (on a sliding scale starting with $100 to $500) in December 2010 under the direction of Defendant's Training Officer Samantha Ward. These bonuses were included in the employees' paychecks.

48.     Defendant's ambulance personnel were also given "cheat sheets" by Samantha Ward listing patient conditions that would support Medicare and Medicaid

reimbursement. These cheat sheets were given to all of the Defendant's ambulance personnel. They were used by them to falsely characterize the patients' condition in the Patient Care Reports as noted above. In addition, the cheat sheets were placed in Defendant First Med's lounge and by the time clocks for each of the crews to take.

49. In addition, Defendant's Training Officer, Samantha Ward, directed ambulance personnel on how to misrepresent a patient's condition to justify their need for an ambulance. For example:

- If they found a patient standing when they arrived they asked the patient to return to bed so their condition could be falsely recorded as "found in bed";

- If a patient was missing only a toe, they were to be labeled "BKA" for "below knee amputation" even though their missing toe would not make them eligible for ambulance transportation;

- They were required to carry all patients to the ambulance on a stretcher even if they were ambulatory.

50. By way of example, in late 2009 or early 2010, Relator-Plaintiff Viel recalls seeing one of Defendant's employees push a patient in a wheelchair from a nursing home to a dialysis facility which happened to be located across the street from the nursing home. Of course, it is believed that Defendant billed the patient's insurer for an ambulance transport when none took place. This incident took place at Chesapeake Healthcare Nursing Home in Chesapeake, VA.

51. As a result of the aforementioned fraudulent practices, the Defendant misrepresented the ambulatory conditions of the patients it transported, as shown by the following examples:

a. Patient M.A. as having a "fracture";

14

      b.      Patient B.B. was an "amputee";

      c.      Patient S.G. had "contractures of joints";

      d.      Patient S.T. had a "risk of falling";

      e.      Patient R.G. required "special handling" due to "pain"; and

      f.      Patient O.G. had "cognitive defects".

52.     With respect to the claims where the Defendant received reimbursement but the beneficiaries' condition did not justify transportation by ambulance under the applicable regulations/guidelines, Medicare and Medicaid would not have paid these claims if they had known that the patients' conditions did not meet Medicare and Medicaid's requirements for reimbursement of ambulance transportation.

53.     Officials charged with responsibility to act did not know, and could not reasonably have known, the true medical condition of the beneficiaries for whom false or fraudulent claims for payment as described in this Complaint were submitted by the Defendant to Medicare and Medicaid.

## COUNT ONE
### (False Claims Act-31 U.S.C. § 3729(a)(1)(A))

54.     Relator-Plaintiff Viel re-alleges and incorporates by reference the allegations of paragraph 1 through 53.

55.     By virtue of the acts described above, Defendant Eastern Shore Ambulance, Inc., d/b/a First Med, Inc. knowingly presented or caused to be presented to the United States false or fraudulent Medicare and Medicaid claims for payment or approval, in violation of the FCA, as amended, 31 U.S.C. § 3729(a)(1)(A); that is, Defendant knowingly made or presented, or caused to be made or presented, to the United States claims for payment for services which were false, in that the services

claimed for were not medically necessary or otherwise did not qualify for reimbursement under the Medicare or Medicaid programs.

56.     By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial.

WHEREFORE, Relator-Plaintiff Viel respectfully requests that the Court enter judgment against the Defendant Eastern Shore Ambulance, Inc. d/b/a "First Med, Inc." as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendant caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(e)     That the Court award such other and further relief as it deems proper.

## COUNT TWO
### (False Claims Act-31 U.S.C. § 3729(a)(1)(B))

57.     Relator-Plaintiff Viel re-alleges and incorporates by reference the allegations of paragraph 1 through 56.

58.     By virtue of the acts described above, Defendant Eastern Shore Ambulance, Inc., d/b/a First Med, Inc., knowingly made or used a false record or statement to get a false or fraudulent Medicare and Medicaid claim paid or approved by

the United States, in violation of the False Claims Act, as amended, 31 U.S.C. §
3729(a)(1)(B); that is, Defendant knowingly made or used or caused to be made or used
false Medicare and Medicaid claim forms and supporting materials, such as internal
billing forms, and false certifications of the truthfulness and accuracy of claims
submitted, to get false or fraudulent Medicare and Medicaid claims paid or approved by
the United States, in that the services claimed for were not medically necessary or
otherwise did not qualify for reimbursement under the Medicare or Medicaid programs.

59.     By reason of the foregoing, the United States suffered actual damages in
an amount to be determined at trial.

WHEREFORE, Relator-Plaintiff Viel respectfully requests that the Court enter judgment
against the Defendant Eastern Shore Ambulance, Inc., d/b/a First Med. Inc. as follows:

(a)     That the United States be awarded damages in the amount of three times
the damages sustained by the U.S. because of the false claims alleged
within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. §
3729 *et seq.* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim
that Defendant caused to be presented to the Government Healthcare
Programs under the Federal False Claims Act;

(c)     That pre- and post-judgment interest be awarded, along with reasonable
attorneys' fees, costs, and expenses which the Relator necessarily incurred
in bringing and pressing this case;

(d)     That the Relator be awarded the maximum amount allowed pursuant to the
Federal False Claims Act; and

(e)     That the Court award such other and further relief as it deems proper.

## COUNT THREE
### (VA Fraud Against Tax Payers Act)

60.     Relator-Plaintiff Viel re-alleges and incorporates by reference the
allegations of paragraph 1 through 59.

61.     This is a *qui tam* action brought by Relator-Plaintiff on behalf of the Commonwealth of Virginia for treble damages and penalties under Virginia Fraud Against Tax Payers Act, §8.01-216.3a, which provides liability for any person who –

- Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

- Knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth;

- Conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim; and

- Is a beneficiary of an inadvertent submission of a false claim to the commonwealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

62.     In addition, VA Code Ann. § 32.1-315 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Virginia Medicaid program.

63.     Defendant Eastern Shore Ambulance, Inc., d/b/a First Med, Inc. violated VA Code Ann. § 32.1-315 by engaging in the conduct alleged herein.

64.     Defendant furthermore violated Virginia's Fraud Against Tax Payers Act, § 8.01-216.3a, and knowingly caused hundreds of thousands of false claims to be made, used and presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

65.     The Commonwealth of Virginia, by and through the Virginia Medical Assistance Program (Medicaid) was unaware of Defendant's conduct and paid the claims submitted or caused to be submitted, by the Defendant as described herein.

66.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendant's conduct. Compliance with applicable Virginia statutes, and regulations was also an express condition of payment of claims submitted to the Commonwealth of Virginia.

67.     Had the Commonwealth of Virginia known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by the Defendant as described herein.

68.     As a result of Defendant's violations of Virginia's Fraud Against Tax Payers Act, § 8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

69.     Relator-Plaintiff Viel is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Virginia's Fraud Against Tax Payers Act § 8.01-216.3, on behalf of himself and the Commonwealth of Virginia.

70.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely

asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Relator-Plaintiff Viel respectfully requests this Court to award the following damages to the following parties and against Defendant Eastern Shore Ambulance, Inc., d/b/a First Med, Inc.

To the COMMONWEALTH OF VIRGINIA:

(1) Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each False claim which Defendant caused to be presented to the Commonwealth of Virginia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relator-Plaintiff:

(1) The maximum amount allowed pursuant to VA Code Ann. § 32.1-315 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator-Plaintiff incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT FOUR
### (North Carolina False Claims Act)

71.    Relator-Plaintiff Viel re-alleges and incorporates by reference the allegations of paragraph 1 through 70.

72.     This is a *qui tam* action brought by Relator on behalf of the State of North

Carolina to recover treble damages and civil penalties under the North Carolina False

Claims Act, N.C.G.S.A. § 1-605, et seq.

73.     North Carolina False Claims Act, N.C.G.S.A. § 1-607 provides for

liability for any person who:

> (1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

> (3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.

> (4) Has possession, custody, or control of property or money used or to be used by the State and knowingly delivers or causes to be delivered less than all of that money or property.

> (5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the State, makes or delivers the receipt without completely knowing that the information on the receipt is true.

> (6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any officer or employee of the State who lawfully may not sell or pledge the property.

> (7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

74.     In addition, N.C.G.S.A. § 108A-63, prohibits the solicitation or receipt of

any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly

or covertly, in cash or in kind in return for furnishing any item or service for which

payment may be made in whole or in part under the North Carolina Medicaid program.

75.     Defendant violated the North Carolina False Claims Act, N.C.G.S.A. § 1-605, *et seq.* by engaging in the conduct described herein.

76.     Defendant furthermore violated the North Carolina False Claims Act, N.C.G.S.A. § 1-605, et seq. and knowingly caused thousands of false claims to be made, used and presented to the State of North Carolina by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the complained of claims submitted in connection with its conduct were eligible for reimbursement by the government-funded healthcare programs.

77.     The State of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by Defendant in connection therewith.

78.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of North Carolina in connection with Defendant's conduct. Compliance with applicable North Carolina statutes and regulations was also an express condition of payment of claims submitted to the State of North Carolina.

79.     Had the State of North Carolina known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by Defendant in connection with that conduct.

80.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the North Carolina False Claims Act, N.C.G.S.A. § 1-605, *et seq.* on behalf of himself and the State of North Carolina.

81.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF NORTH CAROLINA:

(1)    Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of North Carolina;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to North Carolina False Claims Act, N.C.G.S.A. § 1-605, et seq. and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3)    An award of reasonable attorneys' fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## JURY DEMAND

82.    Plaintiffs demand a trial by jury on all claims

Respectfully Submitted,

23

Respectfully Submitted,

Zachary A. Kitts
Virginia Bar # 47052
Counsel for Relator
Cook Kitts & Francuzenko, PLLC
3554 Chain Bridge Road, Suite 402
Fairfax, Virginia 22030
Phone: 703-865-7480
Fax: 703-434-3510
Email: zkitts@cookkitts.com


Eric Young, Esq.
(NOT ADMITTED IN VIRGINIA
Brandon Lauria
(NOT ADMITTED IN VIRGINIA)
26 E. Township Line Road, Suite 100
Blue Bell, PA 19422
Phone (215) 367-5151
Fax (215) 367-5143